IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

<table>
<tr><td>CHRISTINE MAYS and MARK MAYS,</td><td>:</td><td>HON. JEROME B. SIMANDLE</td></tr>
<tr><td>Plaintiffs,</td><td>:</td><td>Civil No. 11-5836 (JBS/JS)</td></tr>
<tr><td>v.</td><td>:</td><td></td></tr>
<tr><td>GENERAL BINDING CORPORATION, et al.,</td><td>:</td><td><b><u>OPINION</u></b></td></tr>
<tr><td>Defendants.</td><td>:</td><td></td></tr>
</table>

APPEARANCES:

Gary Frederick Piserchia, Esq.
Andrew Charles Rimol, Esq.
PARKER MCCAY P.A.
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, NJ 08054
    Attorneys for Plaintiffs Christine Mays and Mark Mays

Wendy H. Smith, Esq.
John G. O'Brien, Esq.
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
425 Eagle Rock Avenue
Suite 302
Roseland, NJ 07068
    Attorney for Defendant General Binding Corporation

**SIMANDLE**, Chief Judge:

## I.  INTRODUCTION

    This matter is before the Court on the motion of Defendant General Binding Corporation ("Defendant" or "GBC") for summary judgment. [Docket Item 17.]   Oral argument was conducted on March 4, 2013.

    The instant action is a product liability case arising from

Plaintiff Christine Mays's use of a laminating machine while working at an elementary school. Plaintiff Mays, an elementary school teacher, was using the HeatSeal Ultima 65-1 laminating machine manufactured by Defendant General Binding Corp. when she received a static electric discharge while touching the power button to turn off the laminating machine. Plaintiff claims she suffered injury to her right index finger as a result of the discharge of static electricity while using the machine.

Plaintiffs Christine Mays and Mark Mays filed an amended complaint bringing three causes of action against GBC, the only defendant in this case:[1] product liability (Count I); negligence (Count II); and loss of consortium (Count III). Plaintiffs' product liability claim makes three separate allegations. Specifically, Plaintiffs claim Defendant GBC is liable for a manufacturing defect, design defect and failure to warn.

Defendant GBC now moves for summary judgment on all claims. [Docket Item 17.] The Plaintiffs do not oppose granting summary

---

[1] Plaintiffs also brought suit against the fictional defendants John Does 1-5, ABC Companies 1-5, John Does 6-10 and ABC Companies 6-10. It is well established that "if after a reasonable period of discovery a plaintiff has not identified the fictitious defendant, the court may dismiss the fictitious defendant." Martin v. Comunale, No. 03-CV-06793, 2006 U.S. Dist. LEXIS 1692, 2006 WL 208645 (E.D. Pa. January 18, 2006)(citing Agresta v. City of Philadelphia, 694 F. Supp. 117 (E.D. Pa. 1988)). Factual discovery is complete and the Plaintiffs have not moved to name these fictitious parties. Therefore, the court will dismiss Plaintiffs' claims against Defendants John Does 1-10 and ABC Companies 1-10.

judgment on their negligence claim (Count II) and manufacturing defect aspect of their product liability claim. However, the Plaintiffs argue that they have presented sufficient evidence to survive summary judgment on their design defect and failure to warn claims within their product liability count (Count I). The central issue before the court is whether Plaintiffs' expert, George P. Widas, presents sufficient proof in his expert report to establish Plaintiffs' product liability claim either for design defect or for failure to warn.

For the reasons discussed herein, the court finds that Plaintiffs' expert report is insufficient to meet their burden of proof to establish a design defect or a failure to warn claim. Therefore, the court will grant Defendant's motion for summary judgment and Plaintiffs' complaint will be dismissed with prejudice.

## II. BACKGROUND

The facts of this case are straightforward and not heavily disputed by the parties.[2] On April 20, 2010, Plaintiff Christine

---

[2] The following facts are taken primarily from the Defendant's Statement of Material Facts submitted pursuant to L. Civ. R. 56.1(a) and are supported by the record before the court. Local Civil Rule 56.1(a) requires summary judgment movants to submit a statement of undisputed material facts, citing to affidavits and other documents submitted in support of the motion. The opponent of summary judgment shall furnish "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement. . . ." L. Civ. R. 56.1(a). "[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment

Mays was employed as a teacher at an elementary school and was using the school's laminating machine, a HeatSeal Ultima 65-1. (Def.'s Statement of Material Facts ¶¶ 2-3.)  Plaintiff used the laminating machine at issue roughly once a month during the school year from 2008 or 2009 until April 20, 2010, the date of the incident.  Id. at ¶ 5.

On the date of the incident, the Plaintiff was using the laminating machine and when she was finished, went to turn off the machine.  (Pls.' Ex. C and Defs.' Ex. A, Deposition of Christine Mays taken on April 12, 2012 ("Mays Dep.") at 69:1-9.) The machine was on a cart and the Plaintiff was standing behind the machine, between the wall and the machine.  (Mays Dep. at 69:1-21.)  Plaintiff reached down with her right index finger and touched the on/off switch.  (Id. at 69:21-70:11.)  When Plaintiff touched the on/off switch, she felt a sensation from her finger through her arm to her shoulder and the machine made a popping noise but did not spark.  (Id. at 70:25-71:3; 72:1-2.)  The sensation Plaintiff received was a static shock as opposed to an electric shock and was caused by the discharge of static electricity.  (Def.'s Statement of Material Facts ¶ 9.)

The Plaintiff went to the nurse's office immediately after

_____

motion." L. Civ. R. 56.1(a).
        The Plaintiff filed a responsive statement of material facts and admits to the majority of Defendant's factual statements. These uncontested facts will be deemed undisputed for the purposes of this motion.

the shock and filled out an incident report.  In this report,
Plaintiff wrote that she was shocked when she turned off the
laminator and "touched/bumped cord."  (<u>Id.</u> at ¶ 13; Mays Dep. at
78:1-25.)  Plaintiff then testified at her deposition that she
did not touch or bump the cord to the laminating machine and only
wrote that on the incident report because she "was thinking it
was an electrical shock and when I think of electrical shock I
think of cord." (<u>Id.</u> at 15-17.)

This static discharge incident is unique.  Before this
incident, Plaintiff had never been shocked by the laminating
machine nor had anyone else at the school to her knowledge.  <u>Id.</u>
at ¶ 6.  The laminating machine is still being used at the school
presently and Plaintiff is not aware that anyone after this
incident has been shocked.  <u>Id.</u> at ¶ 7.  Karen Rockhill, the
school's principal, testified that no one else had been shocked
by the laminating machine either before or after this incident.
<u>Id.</u> at ¶ 11.

After the incident, the school's buildings and grounds
employees, including possibly an electrician, along with the
local Fire Marshall, examined the laminating machine to try to
determine how the alleged incident occurred and could find
nothing wrong with the machine and could not replicate the
incident.  (Def.'s Statement of Material Facts ¶ 10.)

Over a year later, in November/December 2011, the

laminator's plug had to be replaced because the ground wire prong
was loose.  (Id. at ¶ 12.)  In fact, the ground pin from the
original plug was missing.  (Id. at ¶ 49.)  A break in the
equipment grounding circuit in the power cord assembly will
permit the laminator metal housing to potentially become
energized and may allow static charge to build up on the
laminator.  (Id. at ¶ 50.)  The damage to the power cord that was
replaced was not consistent with normal wear and tear but was
evidence of abuse either through improper insertion, removal or
physical contact which damaged the cord cap.  (Id. at ¶ 52.)
Prior to the incident, Defendant GBC repaired the laminator on
one occasion on February 8, 2010, replacing the main display and
control boards.  (Id. at ¶ 16.)

    According to Defendant GBC, the laminating machine is
designed to "dissipate static electricity as best as possible."
Id. at ¶ 22; (Deposition of GBC by Robert Elliot taken June 14,
2012, ("GBC Dep.") at 20:24-21:1.).  This is accomplished through
grounding the machine.  Specifically, the materials in the
laminating machine are grounded through the side frames and the
side frames are then grounded through the power cord and through
the ground prong on the plug.[3]  (Id. at 21:6-10; Def.'s Statement

_____

    [3] At oral argument, Plaintiffs' counsel belatedly argued
that Mr. Elliot was not qualified as an expert and his testimony
could not establish that the laminating machine was grounded.
However, Plaintiffs admitted in their Response to Defendants'
Statement of Undisputed Material Facts that the laminating

of Material Facts ¶ 24.)  This grounding does not result in the dissipation of all static electricity from the machine, and under certain conditions, a static shock could result.  In particular, if the machine is operated in an environment which is dry or carpeted, the static electricity could not get fully discharged and result in a static shock to the user.  (Id. at 23:1-24:17; 41:15-42:5; 51:8-52:24.)

The design and manufacture of similar, competitive products operate on the same principles with the same functional components as the subject laminator.  (Def.'s Statement of Material Facts ¶ 32.)  The design of the laminator here complied with all applicable safety standards and was built to conform to Underwriters Laboratories, Inc. ("UL") 963 standard for design, was UL tested and was considered safe and fit as a result. (Def.'s Statement of Material Facts ¶ 33.)

Of nine similar competitors' laminators, not one included a warning about static discharge and the competitors' literature did not identify static as a hazard associated with their respective machines or warn against potential static shock injuries relating to the operation of their respective machines. (Id. at ¶ 43.)  Further, there were no warnings regarding static

---

machine is "grounded through the side frames and the side frames are then grounded through the power cord and through the ground prong on the plug."  Since this material fact was admitted by Plaintiffs in their L. Civ. R. 56.1(a) statement, it will be deemed undisputed for purposes of this motion.

discharge on nine competitors' similar models.  (<u>Id.</u> at ¶ 44.)
The UL standard governing the laminating machine makes no mention
of static in its Instruction and Marking requirements.  (<u>Id.</u> at ¶
45.)

GBC does not consider static electricity to be a hazard or
safety concern.  (GBC Dep. 21:11-24.) GBC was not aware of anyone
ever being hurt by static and no warning for static discharge was
mandated by any safety agency, including OSHA.  (Def.'s Statement
of Material Facts ¶¶ 39, 41.)  GBC had never received another
complaint or claim of anyone shocking themselves with this
machine like Plaintiff has alleged.  (Def.'s Statement of
Material Facts ¶ 40.)

The Plaintiffs filed the instant action on August 17, 2011
in New Jersey Superior Court.  Defendant GBC then removed the
action on the basis of diversity jurisdiction.  [Docket Item 1.]
Defendant GBC now moves for summary judgment.  [Docket Item 17.]

## III.  DISCUSSION

### A.  Parties' Arguments

There is no opposition to Defendant's argument that the
Plaintiff has presented no evidence that GBC's repair of the
laminator in February 2010 prior to the incident was in any way
negligent and since Plaintiffs' negligence claim is based solely
on GBC's prior repair of the machine, summary judgment will be
granted on the negligence count.  There is likewise no opposition

to GBC's argument that the Plaintiff cannot prove a manufacturing defect claim because there is no evidence in the record that this particular laminator deviated from its design specifications or performance standards when it was manufactured in March 2008. Consequently, summary judgment is also appropriate as to this aspect of Plaintiffs' product liability claim.

On the contested aspects of this motion, GBC also moves for summary judgment as to Plaintiffs' design defect claim. Specifically, GBC argues that the Plaintiffs have not presented sufficient proof that there was a practical and technically feasible alternative design which would have prevented the harm to Christine Mays.  The Plaintiffs are required to provide expert testimony regarding alternative designs and GBC argues that Plaintiffs' expert report contains significant gaps and is insufficient to meet Plaintiffs' burden of proof.

Finally, GBC moves for summary judgment as to Plaintiffs' failure to warn claim.  First, GBC maintains that it had no duty to warn because static electricity is not a hazard since it is a by-product of everyday life and is not known to cause injuries. Second, GBC contends that no reasonably prudent manufacturer would have provided a warning about static electricity for this particular laminating machine.  GBC maintains that the laminating machine does not produce harmful amounts of static electricity and Plaintiffs' expert fails to cite one published authority

showing where any individual sustained a direct personal injury from a static discharge like the one that allegedly occurred with this laminating machine.  GBC had never received another complaint or claim of anyone shocking themselves with this laminating machine and there is no evidence in the record that GBC was even aware of any one ever being hurt by static discharge.  Further, no warning for static discharge was mandated by any safety agency and none of the nine competitors included warnings about static electricity on their laminators.

In addition, GBC argues that the Plaintiffs have failed to rule out other possible causes of Plaintiff Christine Mays's alleged injury.  Specifically, there is evidence in the record that the Plaintiff herself stated she bumped the cord to the laminating machine, and later the plug to the machine was replaced because the grounding prong was missing.  It is possible that the Plaintiff received her static shock when she bumped into the cord because the plug, as a result of wear and tear, was not properly grounded.  Since the Plaintiffs' expert did not address this cause or rule out this scenario in his expert report, GBC argues summary judgment should granted in its favor dismissing Plaintiffs' product liability claims.

The Plaintiffs argue that they have presented sufficient evidence to establish their product liability claim based on defective design and failure to warn.  First, Plaintiffs contend

their expert, George Widas, presents enough evidence from which a reasonable fact finder could conclude that the laminator at issue was defectively designed and GBC failed to warn. The Plaintiffs argue that there is no dispute that the laminating machine generates static electricity during use or that the machine does not contain any warnings regarding static discharge. Plaintiffs maintain that their expert report presents sufficient evidence from which a rational jury could find that static electricity can be dangerous and cause injury. The Plaintiffs argue genuine issues of material fact exist which prevent summary judgment.

With regard to GBC's final argument that there are other possible causes of Plaintiff Christine Mays's static shock, Plaintiffs argue that the record is clear the machine was inspected immediately following the April 20, 2010 incident and nothing in the report references problems with the plug. Consequently, Plaintiffs maintain there is no evidence that the plug was damaged on the date of the incident and a rational jury could conclude the plug was damaged at a later time. Therefore, the Plaintiffs argue that summary judgment should be denied.

**B. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the non-moving party."
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
fact is "material" only if it might affect the outcome of the
suit under the applicable rule of law.  Id.  Disputes over
irrelevant or unnecessary facts will not preclude a grant of
summary judgment.  Id.  The Court will view any evidence in favor
of the nonmoving party and extend any reasonable favorable
inferences to be drawn from that evidence to that party.  Hunt v.
Cromartie, 526 U.S. 541, 552 (1999).  See also Scott v. Harris,
550 U.S. 372, 378 (2007) (The district court must "view the facts
and draw reasonable inferences in the light most favorable to the
party opposing the summary judgment motion.").

**C. Analysis**

    1.   <u>Plaintiffs' Negligence and Manufacturing Defect
Claims</u>

There is no evidence in the record to support Plaintiffs'
claim for negligence against GBC arising out of GBC's repair of
the laminator on February 8, 2010.  Plaintiffs have failed to
show that the repair was in any way negligent or that the repair
was a cause of Plaintiff Christine Mays's injuries.

Similarly, there is no evidence to support Plaintiffs' claim
alleging a manufacturing defect.  The Plaintiffs have not
presented any evidence that the laminator used by Christine Mays
deviated from the design specifications, formulae or performance
standards of the manufacturer as required by the New Jersey

12

Product Liability Act, N.J.S.A. 2A:58C-2.

The Plaintiffs do not oppose GBC's motion for summary judgment as to their negligence claim or manufacturing defect claim and therefore, summary judgment will be granted and these claims will be dismissed with prejudice.

      2.  <u>Design Defect</u>

To establish a strict liability claim for design defect, Plaintiffs must satisfy the following elements: (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; and (3) the defect caused the injury to a reasonably foreseeable user.  <u>Jurado v. Western Gear Works</u>, 131 N.J. 375, 619 A.2d 1312, 1317 (N.J. 1993).  New Jersey courts have adopted the risk-utility analysis to determine whether a product was defectively designed.  <u>Johansen v. Makita U.S.A.</u>, 128 N.J. 86, 95 (1992).  In a design defect case, "[a] plaintiff must prove either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm."  <u>Lewis v. American Cyanamid, Co.</u>, 155 N.J. 544, 570 (N.J. 1998).

While "there are seven listed factors in the classical statement of the risk-utility analysis . . . the prevalent view is that, unless one or more of the factors might be relevant in a particular case, the issue upon which most claims will turn is the proof by the plaintiff of a reasonable alternative design . .

13

. the omission . . . [of which] renders the product not reasonably safe." <u>Cavanaugh v. Skill Corp.</u>, 164 N.J. 1, 8 (2000)(citations omitted).[4]

Importantly, an "inference of defectiveness may not be drawn from the mere fact that someone was injured." <u>Zaza v. Marquess and Nell, Inc.</u>, 144 N.J. 34, 49 (N.J. 1996). Further, a manufacturer is not liable for a design defect if, at the time

---

[4] New Jersey courts typically consider seven factors when conducting a risk-utility analysis. These factors include:

> 1. The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
> 2. The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> 3. The availability of a substitute product [that] would meet the need and not be as unsafe.
>
> 4. The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> 5. The user's ability to avoid danger by the exercise of care in the use of the product.
>
> 6. The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product or of the existence of suitable warnings or instructions.
>
> 7. The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

<u>Johansen</u>, 128 N.J. at 96.

"the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product." N.J.S.A. 2A:58C-3(1).

The plaintiff bears the burden of proof in a design-defect case.  <u>Lewis</u>, 155 N.J. at 570.  In order to succeed on a design-defect claim, a plaintiff is "required to prove that a practical and feasible alternative design existed that would have reduced or prevented [her] harm."  <u>Lewis</u>, 155 N.J. at 560.  "Moreover, where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony" to assist the trier of fact "in understanding the mechanical intricacies of the instrumentality and in excluding other possible causes of the accident."  <u>Lauder v. Teaneck Volunteer Ambulance Corp.</u>, 368 N.J. Super. 320, 331 (App. Div. 2004)(citations omitted).

The main issue before the court is whether the report of Plaintiffs' expert, George P. Widas, is sufficient to permit a reasonable jury to find that an alternative design existed which would have prevented the harm to Christine Mays.[5]  Defendant GBC

---

[5] The Plaintiffs have not argued or presented proof that the risk of using the laminator outweighed its utility. Consequently, Plaintiffs' design defect claim is based solely on whether an alternative design existed which would have prevented the harm in this case.

argues that Widas's report has significant gaps; namely, whether his suggested "designed-in features" were capable of being implemented in 2008 when this laminator was manufactured; whether his suggested design features were practical and technically feasible; whether they were used by other manufacturers on similar machines; whether they were economically feasible and whether these features would have eliminated all static electricity and prevented the harm to Christine Mays.

Widas makes one opinion in his 35-page report regarding alternative designs.  Widas concludes: "Designed-in features to protect from electrostatic discharge through the user were and are readily available including removing or neutralizing the static electricity by a well-grounded induction bar, or by ionization neutralizers and web cleaners."  (Widas Expert Report at 34 ¶ 2.)  Widas provides no diagrams or details on this alternative design.  Widas also fails to state whether this design is practical or feasible.  Widas offers no comparisons to other competitive laminators to discern whether these alternative designs are incorporated in other similar machines.  His report offers no estimate of cost of his alternative design.

Previous to this conclusion, Widas stated in his "observation" section that his review of "Recommended Practice on Static Electricity, NFPA 77" indicated that "[a] common method of removing static electric charge from processing machines is

grounding." (Widas Expert Report at 10-11.) Widas does not address the grounding measures that were actually implemented in the design of the laminator at issue or how his alternative "designed-in features" were superior to the grounding technology already utilized by the manufacturer, GBC. Finally, Widas does not conclude that his "designed-in features" would have eliminated all the static electricity of the machine or that Christine Mays would not have been injured if these "designed-in features" were implemented into the laminator's design.

The court finds the Widas report is insufficient to enable Plaintiffs to establish a design defect claim and ultimately it is a net opinion lacking a proper foundation. The Widas report has significant gaps and a rational jury would not be able to conclude that an alternative design was practical and feasible to eliminate the harm.

First, beyond Widas's use of the phrase "readily available" instead of "practical and feasible," he produces no evidence that other manufacturers were using his suggested "designed-in features" or that these features were superior to the grounding technology already employed in the design of the laminator, nor is there evidence extrinsic to Widas's report that other manufacturers were using his alternative design. Widas offers no analysis of the grounding technology utilized in the laminating machine and does not conclude that the grounding technology was

deficient or lacking in any way. Without this underlying analysis and factual basis, Widas's conclusion has no foundation. See Koruba v. American Honda Motor Co., Inc., 396 N.J. Super. 517, 526 (2007)("An expert is required to give the 'why and wherefore' of his opinion, not just a mere conclusion.").

Further, Widas does not provide any diagrams, calculations or specifications of his alternative design. While diagrams are not expressly required to prove an alternative design in a design defect case, several New Jersey courts and District of New Jersey cases have found that an expert's failure to include any specifications about an alternative design renders the report insufficient to sustain a plaintiff's burden of proof on a design defect claim. See Leonard v. Consarc Corp., No. A-1413-10T4, 2012 N.J. Super. Unpub. LEXIS 1790 (Superior Court of New Jersey, App. Div. July 25, 2012)(holding alternative designs require expert opinions and that failure to support alternative designs with specifics is inadequate); H.T. Rose Enterprises, Inc. v. Henny Penny Corp., 317 N.J. Super. 477 (App. Div. 1999)(the mere "oft-handed assertion" of a proposed alternative design is insufficient without a basis that the design is reasonably feasible); Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525 (D.N.J. July 21, 2001)(finding evidence of a reasonably feasible alternative design would likely involve calculations or diagrams).

Here, Widas offers no specifications on how a well-grounded induction bar, ionization neutralizers or web cleaners would be implemented into the design of the laminator. Widas provides no analysis or calculations to determine whether well-grounded induction bars, ionization neutralizers or web cleaners would dissipate static electricity more efficiently than the grounding technology already utilized in the machine's design. Widas also offers no analysis of whether his suggested designed-in features were economically feasible or whether they would impair the function and utility of the laminator. Without this foundation, Widas's opinion is nothing more than a net opinion.

In addition, Defendant GBC points to the testimony of their own expert, Mr. Crabtree, as well as GBC's testimony by Mr. Elliot, which GBC claims refutes Widas's bald conclusion. Specifically, Crabtree testified that he examined nine other competitor laminators and none of these machines incorporated the "designed-in features" recommended by Widas. Crabtree further opined that the small size of the subject laminator does not readily permit the installation of inductive neutralizers, active electric static neutralizers or induction bars. Consequently, Crabtree concludes these alternative designs are not appropriate, practical or feasible. Mr. Elliot testified that one of Widas's recommended designs, an ionizer, could only be used on large commercial machines and was determined to be unsafe for smaller

laminators, like the one at issue in this case, because an ionizer would expose the user to a reverse charge.

It is clear that Widas's report is lacking specificity and a factual basis for his alternative design theory. There is, essentially, no design presented. The Plaintiffs have failed to present sufficient expert testimony from which a reasonable fact finder could conclude that a practical and feasible alternative design existed. Significantly, Widas does not provide any foundation to support his conclusion for his alternative design. Widas does not conclude that this design was practical and feasible in 2008 but vaguely states these design-in features were "readily available." Widas does not discuss the efficacy of these design-in features as compared with the grounding technology already utilized in the design of the laminator. Widas provides no calculations, diagrams or analysis of the implementation of these designs on the subject laminator. Widas also fails to opine that his alternative design would have prevented or reduced the harm to Christine Mays. These logical gaps and critical omissions in Widas's report are significant and, together with the uncontradicted facts that no comparable machine uses an alternative design, give a rational jury no basis for concluding that Widas's proposed design alternatives are practical and feasible. Therefore, summary judgment will be granted as to the Plaintiffs' design defect claim.

3. <u>Failure to Warn</u>

The New Jersey Product Liability Act also provides a cause of action against a manufacturer or seller of a product "if the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because . . . it failed to contain adequate warnings or instructions." N.J.S.A. 2A:58C-2. In a failure to warn case, a plaintiff must initially establish that the defendant had a duty to warn. <u>James v. Bessemer Processing Co.</u>, 155 N.J. 279, 297 (1998). After the plaintiff has established a duty, the plaintiff then must show that the product lacked an adequate warning and this failure to warn caused the plaintiff's injuries. <u>Id.</u>; <u>Coffman v. Keene Corp.</u>, 133 N.J. 581, 593-94 (1993).

To establish a duty to warn:

the plaintiff must satisfy a very low threshold of proof in order to impute to a manufacturer sufficient knowledge to trigger the duty to provide a warning of the harmful effects of its product. In cases proceeding under a theory of strict liability, knowledge of the harmful effects of a product will be imputed to a manufacturer on a showing that knowledge of the defect existed within the relevant industry. Once proof of such knowledge in the industry has been established, triggering the duty to warn, the plaintiff must show that an adequate warning was not provided.

<u>James</u>, 155 N.J. at 297-98 (internal citations omitted). An adequate warning under the Product Liability Act "is one that a reasonably prudent person in the same or similar circumstances would have provided . . . taking into account the characteristics

21

of, and the ordinary knowledge common to," the foreseeable user.
See N.J. Stat. Ann. § 2A:58C-4.

In this case, there was no warning on the laminator with
regard to the risk of static electricity. The issue before the
court is whether Plaintiffs' expert, George P. Widas, has
presented sufficient evidence in his report that the industry had
knowledge of the harmful effects of static electricity in
relation to this type of laminator.[6] The issue is two-fold.
First, the parties dispute whether static electricity, such as
the shock experienced in this case, is actually harmful. Second,
the parties argue whether the Plaintiff has presented sufficient
proof that the industry was aware of the harm, if any, caused by
static electricity.

Widas states in his report:

> Static electricity can build up on the surface of an
> object and discharge to a person, causing a shock. When
> friction causes a high level of static build up the
> discharge can be severe. This can happen during normal
> operation of rubberized drive or machine belts found in
> many workplaces. Grounding or other measures may be
> necessary to prevent this static electricity buildup and
> results.

---

[6] It is undisputed by the parties that GBC did not consider
static electricity harmful and the Plaintiffs have presented no
evidence that GBC knew the laminator at issue caused harmful
static shock to its consumers. GBC never received any complaints
of static shock before or after this incident with regard to this
product. Consequently, for the Plaintiffs to establish their
failure to warn claim, they must proceed on a theory of strict
liability based upon knowledge of the harmful effects of static
electricity in the industry.

(Widas Expert Report at 9 ¶4.).  This information was taken from an OSHA document entitled "Controlling Electrical Hazards" from 2000.  (Id. at 8.)  In addition, Widas states in his report that he relied on "Internet research regarding static electricity." (Widas Report at 2.)[7]  Widas then concludes at the end of his report that "static electricity shock (electrostatic shock), such as lightning, seriously injures and kills people."  (Id. at 29.)

However, it is undisputed that no safety agencies mandate a warning about static electricity and OSHA has no standard that squarely addresses direct personal injury from static discharge as a workplace hazard.  GBC's expert, Mr. Crabtree, opines that "direct static discharge is not a recognized cause of personal injury."  (Def.'s Ex. H, Crabtree Expert Report at 9.)  Defendant GBC goes further and submits a second expert report by Stephen L. Young of Applied Safety and Ergonomics who opines that the static electricity at issue in this case is not a hazard.  (Def.'s Ex. I.)  Plaintiffs acknowledge in their brief that if static electricity cannot cause direct physical injury, then GBC cannot be found liable for failing to warn.  (Pl.'s Opp. at 9.)

As a preliminary matter, it is unclear from the record what injury, if any, Plaintiff Christine Mays suffered as a result of her static shock.  During oral argument, Plaintiffs' counsel

_____

[7] Widas also indicates that he consulted safety manuals from 1914, 1929, 1943 and 1949.  (Widas Report at 3.)

clarified that Christine Mays suffered a burn to her right index finger which has resulted in a loss of feeling and tingling sensation. Counsel further explained that Plaintiff Christine Mays currently experiences pain in her right index finger when she engages in everyday functions, such as typing. The Plaintiffs, however, submitted no record evidence in support of these allegations. For the purposes of this motion, GBC does not contest that Plaintiff Christine Mays suffered the above injury as a result of static shock from the laminator.

There seems to be a genuine issue of material fact with regard to whether static electricity causes injury. While Mr. Widas's report may not be the most detailed or specific, he does offer evidence that static electric discharge can cause personal injury. However, similar to Widas's design defect opinions, his opinions with regard to static electricity lack an appropriate factual basis. The section of his opinion discussing static discharge broadly discusses electric shock which is distinct from static discharge. Further, in his conclusion, Widas compares the static discharge felt by Plaintiff to lightning, which is grossly exaggerated and inappropriate. Since neither electric shock nor lightning occurred here, Mr. Widas's report is not probative of the issues in this case and not helpful to the finder of fact.

More significantly, Mr. Widas fails to include in his report any analysis regarding prior injuries caused by the dissipation

of static discharge from this type of laminating machine.  Mr. Widas's report is completely devoid of any discussion of previous injuries similar to Christine Mays's injuries resulting from static discharge whether in a laminating machine or any comparable consumer product.  The Plaintiffs have presented no proof aside from Mr. Widas's net opinion that static discharge causes injury, let alone injuries like the kind Christine Mays suffered.  Further, Widas examined the laminator at issue and did not replicate the incident.  The court must conclude from the record before it that Christine Mays's injuries are unique and Plaintiffs' failure to warn claim is based entirely on an unprecedented sample-of-one incident.

In addition to the preliminary issue of whether static discharge from a machine of this nature can cause injury, there is the larger issue of whether the Plaintiff has submitted sufficient evidence from which a jury could rationally determine that the risks of static discharge were known in the industry. Here, Widas offers no proof or analysis in his report that other members of the industry provided warnings with regard to static electricity.  Widas does not analyze competitor products, address the required safety standards for this product or show that other manufacturers provided warnings about static electricity. Nothing in the literature suggests that risk of injury from static discharge should prompt warnings to users of these devices

or any analogous machine.

In contrast, Defendant's expert, Mr. Crabtree, opined that the laminator at issue complied with all applicable safety regulations, that nine competitors' laminators did not provide warnings for static electricity and no government or safety agency mandates warnings for static electricity. (Def.'s Ex. H, Crabtree Expert Report.) This complete absence of analysis of industry practices renders Mr. Widas's opinion insufficient to impute knowledge of the hazards of static discharge on GBC under a strict liability theory. Without showing the industry knew of this hazard, the Plaintiffs have failed to meet their burden to establish duty to warn. There may be a dispute of fact about whether static electricity causes injury; however, this dispute becomes immaterial as a result of Widas's failure to present evidence of knowledge within the industry about harms caused by static discharge in products that are similar to the laminating machine at issue.

Accordingly, the court will grant Defendant GBC's motion for summary judgment as to this claim. The Widas report fails to present evidence of knowledge within the industry about harms caused by static discharge from this type of product or any similar product and consequently, the Plaintiffs have failed to

establish that Defendant GBC had a duty to warn in this case.[8]

####    4.  Loss of Consortium

Plaintiff Mark Mays brings a claim for loss of consortium, which is a derivative claim intended to compensate a person for the loss of a spouse's society, companionship and services due to the fault of another.  See Kibble v. Weeks Dredging & Constr. Co., 161 N.J. 178, 735 A.2d 1142, 1149 (N.J. 1999) (describing loss of consortium).  Since the court has granted summary judgment dismissing Plaintiff Christine Mays's product liability claims, this claim for loss of consortium must also be dismissed with prejudice.

## IV.  CONCLUSION

For the reasons discussed herein, the court will grant

---

[8] The parties also argue whether Widas's expert report is insufficient because he fails to address other possible causes of Plaintiff Christine Mays's static shock, namely her bumping into the power cord when she reached to turn off the machine.  There is a possible dispute whether Plaintiff actually bumped into the power cord and whether the power cord was in a damaged condition at the time of the incident.  It is undisputed that Widas does not discuss the possibility or implication of Plaintiff bumping into the power cord in his expert report, and Plaintiff disavows touching the power cord.

This issue, however, is only relevant if the court determined Widas's expert report was sufficient to establish either the design defect claim or the failure to warn claim. Since the court found the Plaintiffs have failed to present sufficient proof for their product liability claims, it is unnecessary for the court address this additional argument. Instead, this opinion assumes, in the light most favorable to Plaintiff, that the power cord played no role in causing this static discharge.

Defendant GBC's motion for summary judgment.  The accompanying

Order will be entered.


**May 10, 2013**                              **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              Chief U.S. District Judge